**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 12-81278-CIV-HURLEY**

**ISOCIAL MEDIA INC.,**
  plaintiff,

vs.

**BWIN.PARTY DIGITAL**
**ENTERTAINMENT PLC,**
  defendant.
_____/

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION**
**TO DISMISS SECOND AMENDED COMPLAINT FOR**
**LACK OF PERSONAL JURISDICTION**

  Plaintiff iSocial Media Inc. ("iSocial" or "plaintiff"), a Florida corporation with principal place of business in Palm Beach County, Florida, brought this action against defendant bwin.party digital entertainment plc ("bwin.party" or "defendant"), a Gibraltar corporation and competing global online gaming company, for tortious interference with advantageous contractual and business relationships and unfair competition in violation of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA).  The complaint asserts original subject matter jurisdiction through diversity of citizenship pursuant to 28 U.S.C. § 1332.

  The case is before the court on the defendant's motion to dismiss for lack of personal jurisdiction and improper venue under Fed. R. Civ. P. 12(b) (2) and (3), and alternatively, failure to state a claim upon which relief may be granted pursuant to Fed. R. Civ. P. 12 (b) (6) [ECF No. 29]. The court granted plaintiff's earlier request to stay the motion to dismiss pending completion of jurisdictional discovery, up through July 15, 2013 [ECF No. 35, 73], and subsequently accepted the parties' supplemental briefing and supporting evidentiary submissions filed August 23, 2013 [ECF

Nos. 89, 90, 91]. Having considered all of the papers filed by the parties and the jurisdictional evidence presented [ECF No. 34, 89, 90, 91, 93] the court has determined to grant the motion to dismiss based on lack of personal jurisdiction over the defendant.

## I. STANDARD OF REVIEW

A federal district court sitting in diversity may exercise personal jurisdiction to the extent authorized by the law of the state in which it sits and to the extent allowed under the Constitution. *Meier ex rel Meir v. Sun Int'l Hotels, Ltd.,* 288 F.3d 1264, 1269 (11th Cir. 2002). Accordingly, the court is charged, first, with the task of determining whether bwin.party's activities and contacts in Florida are sufficient to satisfy the requirements of the Florida long-arm statute, and, second, whether sufficient " minimum contacts" existed between bwin.party and Florida so as to satisfy "traditional notions of fair play and substantial justice" under the Due Process Clause of the Fourteenth Amendment. *Mutual Serv. Ins. Co. v. Frit Industries, Inc*., 358 F.3d 1312 (11th Cir. 2004); *Cable/Home Communication v. Network Products,* 902 F.2d 829 (11th Cir. 1990).

iSocial, as the plaintiff, has the burden of establishing a *prima facie* case of personal jurisdiction under these requirements. *Meier ex rel Meier v. Sun Int'l Hotels, Ltd*, 288 F.3d 1264 (11th Cir. 2002). A *prima facie* case is established if the plaintiff presents sufficient evidence to defeat a motion for directed verdict. *Snow v. DirecTV, Inc*. 450 F.3d 1314 (11th Cir. 2006), citing *Madara v. Hall*, 916 F.2d 1510 (11th Cir. 1990); *United Techs Corp v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009).

In making its assessment of the sufficiency of plaintiff's case, the court accepts the facts alleged in the complaint as true, to the extent they are uncontroverted by the defendant's affidavits. *Delong Equipment Co. v. Washington Mills Abrasive Co.*, 840 F.2d 843, 845 (11th Cir. 1988).

2

Where the defendant submits affidavits contrary to the allegations in the complaint, the burden shifts back to the plaintiff to produce evidence supporting personal jurisdiction, unless the defendant's affidavits contain only conclusory assertions that the defendant is not subject to jurisdiction. *Stubbs v. Wyndham Nassau Resort and Crystal Palace Casino*, 447 F.3d 1357 (11th Cir. 2006). Where the parties' affidavits and deposition evidence conflict, the court must construe all reasonable inferences in the plaintiff's favor. *Id.; Morris v SSE, Inc.,* 843 F.2d 489, 492 (11th Cir. 1988).

Accordingly, the court turns to an examination of the factual materials presented on both sides to decide whether plaintiff has made a *prima facie* showing of personal jurisdiction based on competent evidence. *Byat v Citigroup, Inc*., 512 Fed. Appx. 994 (11th Cir. 2013), citing *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990); *Herman v. Cataphora, Inc.,* ___ F. 3d ___, 2013 WL 5223101 (11th Cir. 2013); *Boit v. Gar-Tec Prods., Inc*., 967 F.2d 671, 675 (1st Cir. 1992); *In re Magnetic Audiotape Antitrust Litigation*, 334 F.3d 204, 206 (2d Cir. 2003).

## II. DISCUSSION

Personal jurisdiction may be general or specific. General jurisdiction refers to the power of a court to adjudicate any cause of action involving a particular defendant if that defendant engaged in "substantial and not isolated" activity within Florida, regardless of whether the claim asserted arose from that activity. *Meier v. Sun Int'l Hotels, Ltd*., 288 F.3d 1264 (11th Cir. 2002). Thus, general jurisdiction is based on a defendant's contacts with the forum state that are not necessarily related to the cause of action litigated. *Consol. Dev. Corp. v. Sherritt, Inc.,* 216 F.3d 1286, 1293 (11th Cir. 2000). It requires a showing of "continuous and systematic" general business contacts within the state, *Trustees of Columbia University v. Ocean World, S.A.,* 12 So.3d 788, 792 (Fla. 4th DCA 2009), which may be found where a nonresident's activities are "extensive and pervasive, in that a

3

significant portion of the defendant's business operations or revenue derived from established commercial relationships in the state," or where a defendant "continuously solicits and procures substantial sales in Florida." *Id.*

In contrast, specific jurisdiction exists where the plaintiff's cause of action arises from or is directly related to the defendant's contacts with the forum state. *Oldfield v. Pueblo de Bahia Lora, S.A.,* 558 F.3d 1210, 1221 n. 27 (11th Cir. 2009); *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357, 1360 n. 3 (11th Cir. 2006); *Consolidated Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286 (11th Cir. 2000). The requirement that the plaintiff's cause of action "arises from" the defendant's activities is broader than the concept of "proximate cause," and is satisfied by a showing of some "direct affiliation, nexus, or substantial connection between the cause of action and the [defendant's] activities within the state." *Sun Trust Bank v. Sun Int'l Hotels, Ltd*, 184 F. Supp. 2d 1246, 1269 (S.D. Fla. 2001).

Under either theory, the assertion of jurisdiction must also be reasonable and fair so as to satisfy due process requirements of the Fourteenth Amendment. *Burger King Corp. v. Rodzewicz*, 471 U.S. 462, 472-73, 105 S. Ct. 2174, 85 L. Ed.2d 528 (1985); *Madara v. Hall*, 916 F.2d 1510, 1516 n. 7 (11th Cir. 1990); *Consolidated Dev. Corp. v. Sherritt, Inc.,* 216 F.3d 1286, 1292 (11th Cir. 2000).

In this case, iSocial argues that bwin.party is subject to (1) general jurisdiction under § 48.193(2) of the Florida long-arm statute, and (2) specific jurisdiction under § 48.193(1)(a)(2) and (a)(6) of the Florida long-arm statute. The relevant provisions of § 48.193, Florida Statutes,

4

identifying acts that may subject a defendant to jurisdiction in Florida provide[1]:

> (1) (a) A person, whether or not a citizen or resident of this state, who personally or through an agent does any of the facts enumerated in this subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action arising from any of the following acts:
> ….
> 2. Committing a tortious act within this state.
> ….
> 6. Causing injury to persons or property within this state arising out of an act or omission by the defendant outside this state, if, at or about the time of the injury …. (a) The defendant was engaged in solicitation or service activities within this state ….
>
> (2) A defendant who is engaged in substantial and not isolated activity within this state, whether such activity is wholly interstate, intrastate, or otherwise, is subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity.

§ 48.193, Fla. Stat. (2013).

With this background, a summary of the facts and events giving rise to iSocial's causes of action, drawn from the allegations of plaintiff's complaint and evidence developed in jurisdictional discovery, is set forth below.

## A. FACTS

Defendant bwin.party is a Gibraltar corporation with a principal place of business in Gibraltar formed in March 31, 2011 from the merger of bwin Interactive Entertainment AG and PartyGaming Plc ("bwin.party"). Bwin.party's flagship product is "PartyPoker," a real money gaming website, which it launched in 2011. Between 1997 to October 2006, bwin.party offered real money online gaming to players in the United States, including Florida players. However, after passage of the

---

[1] The plaintiff identifies the relevant portions of the Florida long-arm statute governing specific jurisdiction as §48.193(1)(b) and §48.193 (1)(f). However, sub-section (1) of the Florida long-arm was rewritten and renumbered by amendment effective July 1, 2013, and these provisions now appear at §48.193(1)(a)(2) and §48.193(1)(a)(6) respectively. For ease of reference and consistency, in this order these provisions of the Florida long-arm are described using the renumbering employed under the 2013 amendment to the statute.

5

Unlawful Internet Gambling Enforcement Act (UIGEA) of 2006, 31 U.S.C. §§ 5361-5367, effective October 13, 2006, bwin.party ceased all real money gaming in the United States and blocked access to PartyPoker and its other real money gaming websites from any United States–based IP addresses.[1]

iSocial is a Florida corporation also engaged in the online gaming business. In November 2011, iSocial launched a website called "www.partystarpoker.com" and its principal, William Jordan Soffin, began negotiating with Ongame Network, Ltd. (Ongame), a wholly-owned subsidiary of bwin.party, to explore a business partnership aimed at expanding the functionality of the www.partystarpoker.com website. Soffin communicated primarily with Don Jacques, Director of Business Development for Ongame, and alerted Jacques that iSocial then owned and operated the www.partystarpoker.com website. Negotiations stalled in early April, 2012, when Jacques informed Soffin that while a final decision had not yet been made, Ongame likely did not have the technological infrastructure necessary to support the expansion of iSocial's business.

Jacques ultimately advised Soffin on April 5, 2012, that he still had no final decision but understood iSocial's need to "shop around" for an alternate partner in light of this delay. At this juncture, Soffin questioned Jacques about his impressions of an entity known as "Openlot" as a prospective alternative technology service provider for iSocial. Jacques disclaimed familiarity with Openlot, but did offer comments on an Openlot affiliate known as "Microgaming."

According to iSocial, throughout the course of these negotiations, Jacques consistently

---

[1] In April 2009, bwin.party signed a Non-Prosecution Agreement with the United States Attorneys' Office, agreeing to maintain a permanent restriction preventing real money gaming services from being provided to U.S. customers if in violation of the law of the United States or of any jurisdiction within the United States. It also agreed to continue to cooperate in the U.S. Attorney's Office investigation and to forfeit $105 million, payable over three years, representing proceeds of bwin.party's U.S. online real money gaming operations [ECF No. 29-1].

6

advised that he needed the approval of Ongame's parent company (bwin.party) before making any commitments on behalf of Ongame. From this, plaintiff extrapolates that bwin.party was aware of Soffin's negotiations with Jacques, necessarily knew that iSocial owned and operated the partystarpoker website, and, through Jacques' acquiescence in iSocial's partnership with Openlot, effectively consented to iSocial's use of the partystarpoker mark on its www.partystarpoker.com website. Bwin.party contests the urged inference, supplying the contrary affidavit of Don Jacques, who avers that he never brought iSocial's partnership proposal to the attention of bwin.party because he, as Director of Business Development for Ongame, made a threshold determination that the proposal was not suitable. He also avers that the "Party Star Poker" brand was never a focal point of his discussions with Soffin. Bwin.party also supplies the affidavit of former bwin.party CEO Jim Ryan, who likewise avers that he was unaware of business negotiations between Ongame and iSocial.

After iSocial's overture to Ongame was declined, it turned to Paxson Marketing, Ltd (Paxson), a Cyprus affiliate of Openlot, to secure the technology and licensing rights needed to expand its www.partystarpoker.com website. According to iSocial, this development brought it a number of "highly profitable business partnerships and ventures" in the online gaming industry which made it a "serious competitor" to bwin.party.

On June 25, 2012, bwin.party's corporate counsel in Gibraltar, Ciara Boyle, issued a "cease-and-desist" letter to Paxson (in Cyprus) alleging Paxson's infringement of the bwin.party "PartyPoker" registered trademark which bwin.party employed on its website, www.PartyPoker.com, since April 2001. With this letter, counsel threatened initiation of trademark litigation short of Paxson's immediate suspension of the www.partystarpoker website and transfer of the related

7

domain name to bwin.party. According to her affidavit, Boyle had never heard of the "Party Star Poker" brand before she issued this letter, did not know that iSocial purportedly owned it at that time, and was unaware of any prior business discussions between iSocial and the Ongame.

Paxson acquiesced and promptly shut down the www.partystarpoker.com website. According to iSocial, this caused it to lose many profitable business partnerships which elected to discontinue dealings with iSocial after its primary website went down.

On July 12, 2012, Soffin sent an email to bwin.party counsel expressing surprise at bwin.party's opposition to iSocial's use of the "partystarpoker" name. He also advised, in any event, that iSocial had by then received preliminary approval for use of the "partystarpoker" mark from the U.S. Patent and Trademark Office (USPTO). Bwin.party did not rescind the cease-and-desist instructions in the wake of this communication, and this litigation ensued.

### A. General Jurisdiction

iSocial does not dispute that bwin.party has never physically operated a business or business venture in Florida; has never been incorporated under the laws of the State of Florida or had a registered agent or any other authorized agent for service of process in Florida; has never owned assets of any kind located in Florida; has never had a telephone listing or mailing address in Florida, and has not sold any products or performed any services in Florida since it ceased all real money online gaming operations in the United States after the UIGEA took effect in October, 2006. However, it contends bwin.party has engaged in sufficient business activity in this state, either directly or through its subsidiaries, to justify exercise of general jurisdiction under § 48.193(2) of the Florida long-arm statute.

8

1. **Direct Activities**

iSocial contends that bwin.party directly engaged in business in Florida through a course of forward-looking market research and preliminary negotiations with Florida-based partners in anticipation of hoped-for legislative changes aimed at opening up intrastate online gaming operations in Florida. Specifically, it shows that bwin.party conducted a brand survey of Florida consumers in 2011, asking them to rate their awareness of various real money gaming websites. Further, in 2010 and 2011, bwin.party Director of Business Development, David Alen Lang, traveled to Florida on two separate occasions (totaling seven days) to negotiate with prospective Florida gaming partners ahead of the hoped-for legalization of the U.S. online gaming market. However, no deals were consummated as a result of either trip, and because the anticipated legislation ultimately did not pass, bwin.party did not pursue further negotiations with any Florida-based businesses [ECF No. 29-2].

Nevertheless, in a March, 2012 interview with Inside Poker Business, then bwin.party CEO Jim Ryan expressed continued optimism for the possibility of bwin.party's re-entry into the United States online poker gaming market:

> I am the most optimistic I've been since the poker market shut down in the US, without question I can say that. It's almost like the stars have lined up.
> ….
> Right now, given what is happening in the United States, it has given us the perfect catalyst to invest heavily into our product. We've got a market and an opportunity to be the number one network and number one operator in the US marketplace and that's what we're going after.

[DE 26-1].

In order to show that bwin.party was directly engaged in substantial and not isolated activity

9

in Florida, the activities of bwin.party must be "considered collectively and show a general course of business activity in the State for pecuniary benefit." *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623 (11th Cir. 1996). Considering bwin.party's collective activity here, the court does not find the requisite "continuous and systematic" activity in Florida based on bwin.party's exploration of potential Florida-based business partners in anticipation of hoped-for legalization of online gaming markets in Florida. *See e.g. Home Gambling Network, Inc. v. Betinternet.com, PLC*, 2006 WL 1795554 (D. Nev. 2006) (plans to begin accepting wagers from U.S. players held insufficient to establish personal jurisdiction over UK online gaming company); *Clearpractice LLC v. Nimble LLC,* 819 F. Supp. 2d 892 (E.D. Mo. 2011) (conditional prospect of future contractual relationship held insufficient to support finding of personal jurisdiction); *Cypress Pharmaceutical Inc. v. Tiber Laboratories, LLC*, 504 F. Supp. 2d 129 (S. D. Miss. 2007) (plan to eventually sell product in forum state held insufficient to qualify as doing business in forum state under Mississippi long-arm statute); *Safeco Inc. v. Ahn*, 1995 WL 479306 (E.D. Pa. 1995) (party does not avail itself of privilege of conducting business in forum merely by expressing a plan or intention to conduct activity there in the future), citing *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).

Accordingly, the court finds insufficient evidence of direct bwin.party activity in Florida sufficient to sustain exercise of jurisdiction under the "substantial and not isolated" activity general jurisdiction provision of the Florida long-arm statute.

### 2. **Indirect Activities**

The court alternatively examines whether bwin.party has indirectly established a presence in this forum through the activities of its wholly-owned subsidiary, World Poker Tours Enterprises Ltd. (WPT) as a basis for invoking general jurisdiction under § 48.193(2) of the Florida long-arm statute.

The supplemental jurisdictional evidence shows that WPT is incorporated in Nevada, and maintains corporate offices in Irvine, California.  It regularly sponsors live, televised poker tournaments at the Hard Rock Casinos located in Hollywood and Coconut Creek, Florida.  It has hosted twelve live tournaments in Florida since June 2012, and has three more events scheduled before the end of 2013.  It has also partnered with River Gaming LLC, based in Sunrise, Florida, to host a "WPT Boot Camp" in Fort Lauderdale, Florida, offering live lecture, archived footage and game play for students seeking tutoring on all aspects of competitive tournament poker play.

Further, WPT has organized several gambling cruises out of Port Canaveral, Florida, with the most recent cruise hosted between September 8-15, 2013.  iSocial shows that WPT's advertising for these cruises employed the combined use of the WPT Poker logo as well as the bwin.party "PartyPoker" logo, and that one advertisement actually identified "Party Poker" as the sponsor of the event.

Bwin.party, however, denies that the "Party Poker" brand was used with its consent in connection with the WPT Florida cruises.  It submits the affidavit of David Gitter, Vice President of Marketing for WPT since 2001, who avers that WPT hosted a Carribbean Cruise departing from Florida in September, 2012 which was "WPT-branded," with "no PartyPoker branding on the cruise."  It also submits the affidavit of Kriton Kounelakis, the Affiliate Team Leader at bwin.party since 2011, who avers that the bwin.party Affiliate Marketing Department ran three freeroll poker tournaments on bwin.party gaming websites, including PartyPoker.com, in 2012 which awarded WPT Caribbean cruise tickets as prizes.  He states that bwin.party did not create the promotional materials for these cruises; he has never seen the promotional materials supplied by iSocial in this litigation purporting to display bwin.party's  "Party Poker" logo on cruise advertisements; and that

11

the promotional materials in question "appear to have been created by third party affiliates."

As a general proposition, a foreign parent corporation is not subject to the jurisdiction of a forum state merely because one of its subsidiaries is doing business there. *Consolidated Development Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1293 (11th Cir. 2000); Resource *Healthcare of America, Inc. v. McKinney,* 940 So.2d 1139 (Fla. 2nd DCA 2006). This principle is based on the presumption of institutional independence of related corporate entities, which may be rebutted by clear evidence that the subsidiary is merely acting as an agent through which the parent company conducts business in a particular jurisdiction, or that the subsidiary's separate corporate status is formal only, and without any semblance of individual identity; in either of these instances, the subsidiary's business will be viewed as that of the parent and the parent will be viewed as doing business in the jurisdiction through the subsidiary for purposes of asserting personal jurisdiction. *Meier v. Sun Int'l Hotels, Ltd.,* 288 F.3d 1264, 1272 (11th Cir. 2002), *cert. den.*, 534 U.S. 827 (2001).

In determining whether a plaintiff asserting personal jurisdiction has overcome the presumption of corporate separateness, the following relevant non-exhaustive factors are considered: (1) the amount of stock owned by the parent of the subsidiary; (2) whether the entities have separate headquarters, directors and officers; (3) whether corporate formalities are observed; (4) whether the entities maintain separate accounting systems, and (5) whether the parent exercises complete operational control over the subsidiary's general policies or daily activities. *Freudensprung v. Offshore Technical Services, Inc.,* 379 F.3d 327 (5th Cir. 2004).

The latter element of absolute "operational control" is shown where the "the parent corporation exerts such extensive operational control over a subsidiary that the subsidiary is no more than an agent existing to serve only the parent's needs," *Gadea v. Star Cruises, Ltd.*, 949 So.2d 1143

(Fla. 3rd DCA 2007); *Universal Caribbean Establishment v. Bard*, 543 So.2d 447 (Fla. 4th DCA 1989); *Development Corp. of Palm Beach v. WBC Construction, L.L.C.*, 925 So.2d 1156, 1161-62 (Fla. 4th DCA 2006). This requires a showing of "high and very significant" control, to the extent the subsidiary "manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation." *Enic, PLC v. F.F. South & Co.*, 870 So.2d 888, 891 (Fla. 5th DCA 2004), citing *State of Florida v. American Tobacco*, 707 So.2d 851 (Fla. 4th DCA 1998).

The presence of "normal" parent/subsidiary controls – e.g. overlap in directors and officers; parental executive responsibility for the subsidiary's operations, including review and approval of all major policy decisions; parental guarantee of the subsidiary's obligations; joint parent/subsidiary executive conferencing on pricing and products, and the parent's enforcement of goals and directives over the subsidiary --- is not the same as "operational control." *Kramer Motors, Inc. v. British Leyland, Ltd.*, 628 F.2d 1175 (9th Cir.), *cert. den.*, 449 U.S. 1062 (1980). In addition, simple parental ownership of subsidiary stock, enjoying a "unified or global strategy" and goals, cross-selling of promotional materials and the mutual exchange of services for one another are, without more, insufficient to establish the requisite agency relationship. *General Cigar Holdings v. Altadis, S.A.,* 205 F. Supp. 2d 1335 (S.D. Fla. ), *aff'd* 54 Fed. Appx. 492 (11th Cir. 2002). *See generally Dickson Marine Inc. v. Panalpina, Inc.*, 179 F.3d 331 (5th Cir. 1999)*; Hargrave v. Fibreboard Corp*, 710 F.2d 1154 (5th Tex. 1983); *De Jesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65 (2nd Cir. 1996).

To show a "very significant" degree of operational control over the subsidiary, the parent must exercise control to such an extent that the subsidiary manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation. *Florida v. American Tobacco Co.*, 707 So.2d 851, 855 (Fla. 4th DCA 1998). Conversely, the requisite

13

"operational control" is absent where the subsidiary's presence in the forum state is primarily for the purpose of carrying on its own business and where it has preserved "some semblance of independence from the parent." *Meier ex rel. Meir v. Sun Intern. Hotels, Ltd*, 288 F.3d 1264 (11th Cir. 2002).

A distinct corporate identity defeating a finding of agency relationship has been found, for example, where the subsidiary owned its own production facilities, distributed its own products through its own sales organization, maintained its own accounts, paid its own employees and received no actual marketing or strategic plans from the parent, *General Cigar Holdings v. Altadis, S.A.,*, 205 F. Supp. 2d 1335, 1344 (S.D. Fla. 2002), *aff'd,* 54 Fed. Appx. 492 (11th Cir. 2002); where the subsidiary was responsible for organizing its own day-to-day activities, finances, records and accounts, *Abramson v. Walt Disney Co.,* 132 Fed. Appx. 723 (11th Cir. 2005); where the subsidiary unilaterally controlled the placement of marks on its own website, *Cross Country Home Services, Inc. v. Home Service USA Corp.,* 2010 WL 554439 (S.D. Fla. 2010), and where the subsidiary did not need authorization for general corporate activity. *Faro Technologies, Inc. v CimCore Corp*, 2006 WL 4975982 (M.D. Fla. 2006).

In this case, bwin.party contends that the day-to-day operations of WPT are managed and controlled by WPT employees and officers residing in Irvine, California - not bwin.party management. iSocial contests this assertion, introducing evidence of forty-four separate bwin.party policies and procedural manuals which control numerous aspects of the operations of its subsidiaries, including WPT. These include a "Delegation of Authority" policy which requires bwin.party subsidiaries, including WPT, to adhere to bwin.party approved accounting policies, to seek approval from bwin.party on all major policy decisions and financial commitments; to submit to bwin.party

14

internal audit controls, and to seek bwin.party approval over a variety of business operations, including opening of bank accounts; issuance of letters of credit; obtaining gambling licenses; new hires that exceed budget; senior management bonus awards, incentive rules, and retention. In addition, bwin.party "delegation of authority" policies require that all patent or trademark infringement litigation initiated by or against a subsidiary be conducted under oversight of bwin.party General Counsel, and all related litigation costs subject to bwin.party General Counsel control and review.

On the other hand, unrebutted evidence submitted by bwin.party shows that WPT management team is responsible for recruitment, hiring, compensation and firing of WPT employees; that the WPT CEO is responsible for creation and implementation of the WPT budget (subject to bwin.party review and approval of overall strategy and budgetary goals); that WPT maintains its own management personnel who report directly to the WPT CEO; that WPT is comprised of numerous divisions responsible for the day-to-day operations of WPT, including separate finance and legal departments, the heads of which report directly to the WPT CEO; that local WPT management reviews and approves bonuses of less senior WPT employees, and that bwin.party's required accounting policies are those mandated by all local, generally accepted accounting principles, many of which were required to comply with general corporate governance rules.

Jurisdictional discovery further reveals that former bwin.party CEO Jim Ryan controlled selection of the Chief Executive Officer (CEO) at all bwin.party subsidiaries, including WPT, and in fact appointed former WPT CEO Steve Heller, who served from January 2010 through June 2013. However, Ryan's unrebutted deposition testimony also shows that Heller retained authority to build

his own management teams, and to independently create and implement the WPT budget. And, although Ryan frequently consulted with and advised Heller on various management matters -- conversing by telephone once or twice a month by Ryan's estimate, or once or twice a week by Heller's estimate – the ultimate decision –making authority on WPT business operations rested with Heller.

Heller consistently testified that he was responsible for the creation and oversight of WPT business strategy and its day-to-day internal operations. He further testified that WPT had its own legal department which was independently responsible for negotiating and drafting agreements with third parties, overseeing WPT marketing and public relations materials, management of WPT intellectual property, and resolution of all human resources related complaints. The WPT in-house counsel reported to WPT President Adam Pliska, who in turn reported directly to Heller.

Heller also testified that WPT also maintained its own finance department, which also reported directly to Heller and was responsible for day-to-day accounting of the organization, oversight of tax compliance and tax planning, budgets, forecasts and management of employee benefits. In addition, WPT operated its own marketing/promotions department, online gaming department, film studio and land-based touring management department.

As one example of WPT's autonomy in its own day-to-day business affairs, Heller described a contractual agreement which he negotiated with the Seminole Tribe of Florida in 2010 governing WPT tournament events and WPT brand licensing at Seminole Hard Rock Casinos in Florida. Heller avers that bwin.party management did not participate in those negotiations, or otherwise direct or instruct WPT regarding the terms of the agreement or any of its subsequent amendments [91-2].

iSocial does not offer any evidence to contradict these statements regarding WPT internal

16

operational control. Nor does it offer any affirmative evidence to support the contention that bwin.party had any control over the WPT advertising, or that it in any way had specific involvement or knew of WPT's decision to use the "Party Poker" name in any of its promotional materials. Other than this evidence regarding WPT's apparent maverick deployment of the bwin.party "Party Poker" logo, plaintiff has presented no evidence tending to show that WPT effectively functioned as agent of bwin.party. On this evidentiary predicate, WPT's public statements and use of the "Party Poker" mark are not sufficient to ignore the separate corporate entities.

As iSocial fails to meet its burden of showing the existence of an agency relationship between bwin.party and WPT, the activities of WPT cannot be imputed to bwin.party for purposes of establishing general jurisdiction over bwin.party under the "substantial business activities" provision of the Florida long-arm statute. *See e.g. Yellow Pages Photos, Inc. v. Ziplocal*, LP 2012 WL 5830590 (M.D. Fla. 2012); *Cross Country Home Services, Inc. v. Home Service USA Corp.*, 2010 WL 55439 (S.D. Fla. 2010); *In re Farmland Industries, Inc*., 2007 WL 2694308 (M.D. Fla. 2007); *Development Corp. of Palm Beach v. WBC Construction, L.L.C.,* 925 So.2d 1156 (Fla. 4th DCA 2006).

### B. Specific Jurisdiction

iSocial alternatively contends that bwin.party's issuance of a cease and desist letter to its business partner in Cyprus, Paxson, constituted an intentional tort which satisfies the requirements of specific jurisdiction under Fla. Stat. §48.193(1) (a)(2), which provides that jury may be exercised over a non-resident person in a cause of action arising out of the commission of tortious act within the state, or §48.193(1)(a)(6), which provides for exercise of jurisdiction over nonresident who causes an injury within the state arising out of an act or omission taken by the defendant outside the

17

state, if at or about time of injury defendant was engaged in solicitation or service activities within the state.

More specifically, iSocial argues that bwin.party's act of sending a cease-and-desist letter from its counsel located in Gibraltar counsel to Paxson, an iSocial business affiliate, located in Nicosia, Cyprus, constitutes a tortious interference with advantageous business relationship which caused injury to iSocial in the State of Florida. It contends that the tortious act of issuing the letter supplies a basis for exercise of specific jurisdiction under §48.193(1)(a)(2), which has been interpreted to apply to a defendant's commission of tortious acts outside the state that cause injury inside the state. *See Posner v. Essex Ins. Co* 178 F.3d 1209 (11th Cir. 1999). The theory is that a defendant need not be physically present in the state to commit a tort there. *Wendt v Horowitz*, 822 So.2d 1252 (Fla. 2002). The statute has accordingly been interpreted to encompass tortious acts resulting from telephone, electronic or written communications sent into the state. *Id.* However, the exercise of specific jurisdiction under this provision requires that the allegedly tortious communication be purposefully directed at Florida residents, corporations or property located in the State. *Crowe v. Paragon Relocation Resources, Inc.*, 506 F. Supp. 2d 1113 (N.D. Fla. 2007).

In this case, iSocial does not allege that bwin.party directed any tortious communication to it in Florida. Instead, the act constituting the alleged tortious interference – the cease-and-desist letter issued by Gibraltar counsel -- occurred outside the State of Florida and was directed to Paxson, an iSocial business affiliate, in Cyprus. There is no affirmative evidence that bwin.party counsel was aware of the existence of iSocial or its connection to Paxson at the time she issued the letter; indeed, counsel's unrebutted affidavit affirmatively establishes the contrary.

In short, there is no factual support for the proposition that the allegedly tortious

18

communication was purposefully directed to plaintiff in Florida, or the allegation that bwin.party "knew or was reckless in not knowing, that iSocial had trademark rights in the 'partystarpoker' mark when it issued the letter. Specific jurisdiction, therefore, cannot attach based on this communication under 48.193(1) (a) (2). *See Crowe v. Paragon Relocation Resources, Inc.*, 506 F. Supp. 2d 1113, 1121-22 (N.D. Fla. 2007); *White Wave International Labs, Inc. v. Lohan,* Case 2010 WL 3835873 (M.D. Fla. 2010); *PK Computers, Inc. v. Independent Travel Agencies of America, Inc.,* 656 So.2d 254, 255 (Fla. 4th DCA1995).

Moreover, even if iSocial could plausibly allege or show that the cease and desist letter was sent with knowledge of plaintiff's existence or its relationship to Paxson, a single cease-and-desist letter, reserving the right to enforce a trademark, does not qualify as a "purposeful availment" of the privilege of conducting business in a forum state which satisfies due process. *See Stroman Realty Inc. v. Antt*, 528 F.3d 382, 387 (5th Cir. 2008) (lone cease-and-desist letter does not evidence any anticipation of being haled into court, nor put party on notice it might be sued for purposes of satisfying minimum contacts test); *Ehrenfeld v. Mahfouz*, 489 F.3d 542 (2d Cir. 2007)(same); *Miles Bramwell USA, LLC v. Weight Watchers International, Inc.*, 2013 WL 1797031 (E.D. Tex. 2013); *Sportschannel New England Ltd. Partnership v. Fancaster, Inc.,* 2010 WL 3895177 (D. Mass. 2010)(holder of trademark has right to enforce mark without subjecting itself to personal jurisdiction in forums in which it has limited or no substantial contacts).

Because there are no other contacts with Florida that plaintiff asserts could form the basis of an exercise of specific personal jurisdiction over bwin.party, the court rejects the allegedly tortious letter as a basis for exercise of specific jurisdiction under the Florida long-arm statute.

## V. Conclusion

Because the court does not find an evidentiary predicate for assertion of either general or specific personal jurisdiction over bwin.party under the Florida long arm statute, it is unnecessary for the court to reach the constitutional component of the long-arm analysis, or to consider the defendant's remaining challenges to the convenience of the forum or the legal sufficiency of the causes of action.

It is accordingly **ORDERED AND ADJUDGED**:

1. The defendant's motion to dismiss the plaintiff's Second Amended Complaint for lack of personal jurisdiction [ECF No. 29] is **GRANTED**, and the claims against defendant bwin.party are **DISMISSED WITHOUT PREJUDICE** to the re-filing of suit against this defendant in an appropriate forum.

2. A final judgment of dismissal pursuant to Rule 58 shall enter by separate order.

3. A s there is nothing further for the court to do in this action, the Clerk is directed to **CLOSE** this file and terminate any pending motions as **MOOT.**

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida this 10th day of October, 2013.

/s/ Daniel T. K. Hurley
Daniel T. K. Hurley
United States District Judge

cc:  all counsel